DeAnne Casperson, Esq. (ISB No. 6698)
dcasperson@workandwage.com
Amanda E. Ulrich, Esq. (ISB No. 7986)
aulrich@workandwage.com
Ryan S. Dustin, Esq. (ISB No. 8683)
rdustin@workandwage.com
CASPERSON ULRICH DUSTIN PLLC
356 W. Sunnyside Road, Suite B
Idaho Falls, Idaho 83402
Telephone: (208) 524-0566
Facsimile: (208) 745-2523

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOSHUA HATFIELD,<br><br>　　　　　　Plaintiff,<br>v.<br><br>BONNEVILLE COUNTY, a political subdivision of the State of Idaho; and LANCE BATES, in his official and individual capacity,<br><br>　　　　　　Defendants. | Case No. _____<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>Filing Fee: $402.00 |

COMES NOW, Joshua Hatfield, by and through his counsel, Casperson Ulrich Dustin PLLC, and for cause of action against Defendants Bonneville County and Lance Bates, alleges, and complains as follows:

**JURISDICTION AND VENUE**

1. This action is brought under the Americans with Disabilities Acts ("ADA"), 42 U.S.C. § 12101, *et seq.*; the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*; 42 U.S.C. § 1983; the Idaho Human Rights Act ("IHRA"), Idaho Code § 67-5901, *et seq.*; the Idaho Protection of Public Employees Act, Idaho Code § 6-2101 *et seq.*; and the common and statutory law of the state of Idaho.

2. Venue in this action properly lies in the United States District Court for the District of Idaho, Eastern Division, pursuant to 28 U.S.C. § 1391(b) because the claims arose in this judicial district; and venue also properly lies in this district pursuant to 42 U.S.C. § 12117 because the unlawful employment practices were committed in this judicial district.

## PARTIES

3. Plaintiff Joshua Hatfield ("Hatfield" or "Plaintiff") is a male citizen and a resident of the United States of America, who resides in Bonneville County, Idaho.

4. Defendant Bonneville County ("the County") is a political subdivision of the State of Idaho.

5. Defendant Lance Bates ("Bates") is a male citizen and a resident of the United States of America, who resides in Jefferson County, Idaho.

6. The County and Bates are referred to collectively hereafter as "Defendants."

7. At all times material to this Complaint, the County regularly employed fifteen or more persons, and was engaged in an industry affecting commerce, bringing the County within the ambit of 42 U.S.C. § 12111.

8. At all times material to this Complaint, the County was a public agency, bringing it within the ambit of 29 U.S.C. § 2611(4)(B).

## FACTS COMMON TO ALL COUNTS

9. Hatfield realleges and incorporates by reference paragraph 1 through 8 above, as though fully incorporated herein.

10. While Plaintiff was working for another employer, an employee of the County contacted Plaintiff and asked him to apply for a position with the County. Plaintiff did so, the required driving test was waived, and then he was asked to wait about one month for the position with the County to open because of a former employee retiring.

11. Hatfield began working in the Public Works Department in the County on or about August 15, 2018. He took a cut in pay, but Plaintiff felt the benefits of retirement from the County would make up the difference, especially over a long period of time.

12. Over the years, Plaintiff satisfactorily performed his job and received favorable feedback.

13. In roughly late 2018, the County hired a temporary employee (hereinafter "Employee") who had difficulty getting along with the crew.

14. Employee had many informal complaints against him before he was hired full-time.

15. Initially, Plaintiff tried to befriend Employee and help him. Plaintiff even invited Employee to his home several times.

16. Employee admitted to having difficulty with work and life in general because of mental health issues. Employee went through a difficult personal situation and his behavior became even more erratic and scary. Many employees had difficulties dealing with him. Plaintiff and Employee had a falling out and Employee began harassing Plaintiff.

17. Employee told Plaintiff there were some employees at the County he would like to "f*** up" and even was involved in an incident where chairs were thrown in the office.

18. Plaintiff witnessed Employee's erratic behavior, such as Employee cursing, yelling, and throwing fits while flagging, not only in front of the crew, but also in front of the public.

19. Employee would use the radio to make disparaging, aggressive, and slanderous comments about Plaintiff to other employees and upper management.

20. Employee would be inappropriately arguing with management and other employees during the staff morning meetings.

21. Employee would also drive recklessly, putting the crew and public in danger. Employee nearly hit other employees in and out of their vehicles several times.

22. The crew reported Employee's harassing and volatile behavior to Road Supervisor Ken

Ray ("Ray"), Assistant Road Supervisor Wes Packer ("Packer") and Public Works Director Lance Bates ("Bates") on several occasions, but nothing was done.

23. On or about July 21, 2021, Employee was yelling and screaming at Plaintiff because of something he thought he heard him say while on the phone with his wife.

24. Employee cornered Plaintiff against his dump truck, yelling to the point he was spitting in Plaintiff's face, trying to get Plaintiff to fight him. Employee told Plaintiff he was going to "f*** [him] in the face."

25. Plaintiff reported the incident to Ray, who directed Employee to stay away from Plaintiff a week later.

26. Instead of staying away from Plaintiff, Employee parked his truck so close to Plaintiff's truck that he almost hit the side mirror. Plaintiff took a picture and sent it to Ray reporting Employee's harassing and dangerous behavior again.

27. Employee would flip Plaintiff off when he passed him and has nearly hit him with his County truck when they passed on several occasions.

28. Employee's behavior was so erratic and out of control, Plaintiff was scared Employee would try to physically harm him and/or his family.

29. Again, after nothing was done, Plaintiff filed with Bates, Ray, and Packer a written grievance on or about August 2, 2021, against Employee.

30. On or about August 4, 2021, Plaintiff was called into a meeting with Ray and Public Works Secretary Greer Swearingen ("Swearingen") where they told Plaintiff that he was receiving a verbal warning.

31. Plaintiff was shocked and dumbfounded. He objected and told them he had done nothing to be written up for except reporting the ongoing problem with Employee. Plaintiff was assured it was nothing but a verbal warning and it would be removed from his file in six

months as long as nothing else happened.

32. Plaintiff still contested the action but had no choice in the matter.

33. Once more, nothing was addressed, including the grievance. Plaintiff called in sick three scheduled days in a row because of his anxiety and concerns about Employee's stability and fear that he would seriously injure Plaintiff.

34. Plaintiff later learned that another employee's spouse had called and reported concerns about Employee being a safety threat as well.

35. Only after calling in sick and explaining that he may have no choice but to leave did the County actually hold a meeting to address the situation.

36. Plaintiff was concerned so much about Employee's instability and what he might do, he considered quitting his job for his own safety.

37. On or about August 11, 2021, Ray, Bates, and HR Representative Melinda Wallace ("Wallace") held a meeting with Plaintiff and Employee to discuss the grievance and issue Employee a written warning.

38. After that meeting, Wallace asked Plaintiff to stay after to find out if he sincerely thought that Employee was a threat. Wallace suggested that they call Plaintiff's wife to see if she was the anonymous spouse who called about Employee, in which Plaintiff complied.

39. Sometime after the meeting, Employee applied for a position in another department in the County, where he could work in a more isolated environment. However, Employee was not fired for his threats and unstable behavior, but Bates did approve the transfer.

40. After the 6 months had passed, Plaintiff had not heard anything about his verbal write up being destroyed as promised. In April 2022, Plaintiff went to Ray and asked whether it had been destroyed. Ray told Plaintiff that he would destroy it when he had time to look for it. For days afterwards, Ray told Plaintiff that he claimed he could not find the verbal warning.

41. After Plaintiff approached Ray several more times to see the verbal warning was destroyed, Ray informed Plaintiff that Bates would not allow it to be destroyed and it was to remain in his file for a year.

42. Plaintiff reminded Ray that he had been promised by Ray and Swearingen that the verbal warning would only stay in his file a few months and then would be gone.

43. Ray told Plaintiff he would have to accept that the verbal warning would stay in his file and if he had an issue to take it up with Bates.

44. About 8 months after the verbal warning, Plaintiff talked to Bates, who insisted that the letter remain in his file for one year. After asking Bates why the verbal warning needed to remain in his file for a year, Bates said something like, "I'm the boss. And that is what I want," even though Plaintiff just had a great performance review.

45. Plaintiff was frustrated and upset that the County would not stand by its word.

46. Because of Plaintiff's serious concern about the situation with the Employee, he had recorded the conversation in which Ray and Swearingen stated they would remove his verbal warning from the file in six months. He told Bates that if they would not honor the promise they made, he would take the recording and the situation with the Employee to the County Commissioners.

47. However, because of the recording, Bates and Ray finally destroyed the verbal warning.

48. Both Bates and Ray were very angry about Plaintiff forcing them to act as promised based on his assertion that he would take the issue with Employee and the verbal warning to the County Commissioners.

49. On or about August 30, 2022, Plaintiff injured his back preparing his dump truck to haul and spread "hot mix," (hot asphalt) to use for road work.

50. Plaintiff reported the injury to Packer that day or the next day but hoped his injury would

heal and resolve itself.

51. A couple of days later, Plaintiff filled out the first report of injury for worker's compensation.

52. On or about September 6, 2022, Plaintiff was experiencing significant pain and noticed an unusual lump on his back. Plaintiff went to Community Care and was given restrictions of required extra breaks, no lifting more than 6-10 pounds, and no bending.

53. Wallace, on behalf of the County, told him she would try to get him an appointment with the County's worker's compensation doctor of choice and to continue his current restrictions until he could meet with its preferred doctor.

54. In the meantime, the County would not comply with Plaintiff's restrictions. Plaintiff was assigned to work in the Gray's Lake area over rough terrain. The County worked Plaintiff 12-to-13-hour days without any compliance with the restrictions.

55. About one to two weeks later, Plaintiff returned to the doctor after being in severe pain which interfered with his ability to sleep. Plaintiff's doctor issued restrictions of no bending, no squatting, no lifting more than 6-10 pounds, no prolonged sitting, and no prolonged walking and to not return to work until further evaluation.

56. Eventually, Wallace was able to schedule a consultation with a doctor who ordered an MRI without a physical evaluation.

57. On or about September 13, 2022, Plaintiff met with the doctor to go over the MRI results. He released Plaintiff after claiming Plaintiff "was blessed with a youthful spine" and released him for sedentary duty until he felt better. The doctor indicated he would order physical therapy, but workers' compensation did not receive the referral.

58. After being released for sedentary duty, the County repeatedly assigned Plaintiff to jobs not in compliance with the restrictions. The County assigned Plaintiff to not only change

his work schedule but work at the hatch pit screening loads, which requires frequent sitting and standing, bending, and walking, climbing, and descending, twisting, and is very busy.

59. After Plaintiff objected, the County assigned him to type the employee safety manual, but Plaintiff struggled to sit in the chair provided, one that had no ability to adjust for his back. This job assignment also violated his doctor-issued restrictions.

60. Plaintiff has a small family farm, and as a side business grew hay. Plaintiff had about 30 acres of hay to harvest. He specifically asked workers' compensation and the County if they would hire someone to cut it for him, or if not, what he was supposed to do, since Plaintiff was in pain and didn't want to exacerbate his condition. He was told to do what he thought was best but ultimately left alone to make his own decision.

61. On or about September 23 and 24, 2022, Plaintiff had no choice but to harvest the hay. Plaintiff could not afford to leave it in the field to rot or to pay someone else to harvest it, even if he could find someone during the busy harvest season.

62. In order to accommodate Plaintiff's injury, Plaintiff's teenage son helped him harvest the hay. This helped limit Plaintiff's need to move. Plaintiff broke the task up into two days and had his son help limit the tasks Plaintiff had trouble doing such as climbing, lifting, and bending. Plaintiff took any of the medications he could to help him through it.

63. Although the harvest took them longer than usual, with his son's help, Plaintiff could avoid unnecessary bending, squatting, or prolonged sitting or standing, allowing Plaintiff to finish the task safely without causing more injury to his back.

64. Plaintiff used sick leave to take some time off to help his back heal.

65. At no time did the County ever offer Plaintiff FMLA leave.

66. Plaintiff had a follow up appointment on or about September 27, 2023, with the workers' compensation doctor who continued to say there was nothing wrong with him. In fact, he

told him if he was good enough to "cut hay," he was good enough to work.

67. Plaintiff was surprised to hear the workers' compensation doctor's statement, but he knew he had asked workers' compensation how he was supposed to manage the hay harvest. The doctor released him to full duty in spite of Plaintiff's ongoing limitations.

68. The County claimed that Plaintiff was "caught" on video breaking his restrictions, which allegedly violated eight separate County policies but never produced a video to Plaintiff. Plaintiff was suspended with pay until he could have a "Due Process Hearing" on October 14, 2022.

69. At the hearing, Plaintiff was informed that he could have legal counsel, but given only two or three days to obtain a lawyer and was unable to do so on such a short timeline.

70. Plaintiff explained that he did not know how he allegedly broke the numerous listed policies because the letter did not give him any details. When Plaintiff asked for clarification, Bates said he went through the employee handbook and listed any policies he thought could potentially apply.

71. Plaintiff explained the value of the hay and that he had asked if workers' compensation would help him with harvesting it and was told to do what Plaintiff thought was best. He also explained that the County failed to comply with the restrictions repeatedly, that the County knew he was in pain, and that he had restrictions, but still forced him to work 12 to 13 hours a day driving on rough roads as well as heavy lifting, bending, climbing, and twisting.

72. Plaintiff also explained the County assigned him to many jobs which violated his restrictions far more than harvesting hay with his son taking on the tasks he was unable to do because of his back injury.

73. The County terminated Plaintiff's employment on or about October 25, 2022, and gave

him no opportunity for a post-termination hearing.

74. Eventually, Plaintiff had to go through his regular doctor to finally get to a specialist who would treat his back injury. The unbiased doctor said his MRI supported Plaintiff's injury, ordered physical therapy, ordered multiple injections, and prescription medication, and is facing possible ablation to treat Plaintiff's medical condition.

75. The decision-maker for Plaintiff's termination was Bates, who issued the letter proposing Plaintiff's termination and also did not want Plaintiff's verbal warning destroyed when promised.

76. Plaintiff filed a charge of discrimination on or about February 15, 2023, with the Equal Employment Opportunity Commission and the Idaho Human Rights Commission.

77. On or about March 6, 2023, Plaintiff received his Notice of Right to Sue.

78. Plaintiff has exhausted his administrative remedies.

## COUNT I
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT/IDAHO HUMAN RIGHTS ACT
**(Disability Discrimination)**

79. Hatfield realleges and incorporates paragraphs 1 through 78 as though fully set forth herein.

80. Hatfield had an actual disability, a record of disability, and/or a perceived disability, as is defined by the ADA.

81. Hatfield's actual disabilities, of which there is a record, included a physical impairment of the spine, which impacts his muscular skeletal system.

82. Hatfield's impairment of his muscular skeletal system substantially limited Hatfield's major life activities, including his ability to work, stand, lift, bend, twist, climb and sit.

83. Hatfield was a qualified individual under the ADA, *i.e.,* an individual who, with or without reasonable accommodation, could perform the essential functions of the position he held,

including the accommodations of time off, light duty work, or other limited restrictions.

84. The County took adverse employment action against Hatfield when it terminated Hatfield's employment.

85. As a direct and proximate result of Defendants' actions and/or failure to act, Plaintiff has suffered and will continue to suffer loss of earnings, benefits, and job opportunities, as well as emotional distress consisting of outrage, shock, and humiliation. Plaintiff is therefore entitled to general and compensatory damages, in an amount to be proven at trial, as well as any other equitable remedies available to him.

## COUNT II
## VIOLATION OF THE AMERICANS WITH
## DISABILITIES ACT/IDAHO HUMAN RIGHTS ACT
**(Failure to Accommodate)**

86. Plaintiff realleges and incorporates paragraphs 1 through 85 as though fully set forth herein.

87. Plaintiff is an individual who had an actual disability as defined by the ADA/IHRA.

88. The County had notice of Hatfield's disability.

89. Although Plaintiff's doctor ordered workplace restrictions, the County refused to comply and continued to have Plaintiff perform his regular duties, instead of providing light duty work or providing him time off.

90. When Plaintiff's doctor modified the restrictions, the County still failed to make reasonable accommodations for Hatfield.

91. Rather than make reasonable accommodations for Hatfield, the County took adverse employment action against Hatfield by terminating his employment.

92. As a direct and proximate result of Defendants' actions and/or failure to act, Plaintiff has suffered and will continue to suffer loss of earnings, benefits, and job opportunities, as well as emotional distress consisting of outrage, shock, and humiliation. Plaintiff is therefore

entitled to general and compensatory damages, in an amount to be proven at trial, as well as any other equitable remedies available to her.

## COUNT III
## VIOLATION OF THE AMERICAN
## WITH DISABILITIES ACT/IDAHO HUMAN RIGHTS ACT
### (Retaliation)

93. Hatfield realleges and incorporates paragraphs 1 through 92 as though fully set forth herein.

94. Hatfield engaged in a protected activity by reporting his back disability and requesting reasonable accommodation.

95. Plaintiff also engaged in protected activity when he reported to the County that the job tasks assigned to him by the County failed to comply with his restrictions.

96. As a result of Plaintiff's protected activities, the County retaliated by assigning him to jobs that exacerbated his medical condition and violated his doctor's restrictions.

97. The County further retaliated against Plaintiff by terminating his employment for engaging in activities that complied with Plaintiff's restrictions and were done on his own time.

98. Such adverse actions by the County constitute retaliation against Hatfield for exercising his federally and state protected rights.

99. As a direct and proximate result of Defendants' actions and/or failure to act, Plaintiff has suffered and will continue to suffer loss of earnings, benefits, and job opportunities. Plaintiff is therefore entitled to general and compensatory damages, in an amount to be proven at trial, as well as any other equitable remedies available to him.

## COUNT IV
## VIOLATION OF THE IDAHO PROTECTION OF
## PUBLIC EMPLOYEES ACT

100. Hatfield realleges and incorporates paragraphs 1 through 99 as though fully set forth herein.

101. Plaintiff communicated to the County in good faith the existence of waste of public funds, property, or manpower, and/or a violation or suspected violation of a law, rule, or

regulation of the state of Idaho, political subdivision of the state of Idaho, or the United States.

102. Plaintiff communicated in good faith multiple criminal assaults of Plaintiff, battery, harassment and threatened battery by Employee directed at Plaintiff.

103. Plaintiff also communicated with good faith to the County, the violation of his civil rights in the form of denial of accommodations.

104. The communication was made at a time and in a manner that gave the County a reasonable opportunity to correct the violation.

105. The County took adverse action against Plaintiff by issuing him a verbal warning because of his good faith report of waste of public funds, property, or manpower, and/or a suspected violation of law, rule, or regulation of the state of Idaho, a political subdivision of the state of Idaho, or the United States.

106. When Plaintiff insisted that the County remove the verbal warning as promised, the County refused to remove the verbal warning.

107. The County took adverse action against Plaintiff by terminating his employment after Plaintiff requested accommodations. The County refused to make such accommodations.

108. The County took such adverse actions against Plaintiff as a result of his protected activity in reporting a violation or suspected violation of law, rule, or regulation of the State of Idaho, political subdivision of the State of Idaho, or the United States.

109. As a direct and proximate result of Defendants' actions and/or failure to act, Plaintiff has suffered and will continue to suffer loss of earnings, benefits, and job opportunities, as well as emotional distress consisting of outrage, shock, and humiliation. Plaintiff is therefore entitled to general and compensatory damages, in an amount to be proven at trial, as well as any other equitable remedies available to him.

## COUNT V
## 42 U.S.C. § 1983
## PROEDURAL DUE PROCESS

110. Hatfield realleges and incorporates paragraphs 1 through 109 as though fully set forth herein.

111. The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty or property, without due process of law."

112. Plaintiff had a protected property interest in his employment in that the County Commissioners passed policies for the County, one of which promised employees, like Plaintiff, that "regular employees of Bonneville County, other than those designed as employed-at-will, shall not be suspended without pay, demoted with an accompanying change in pay, or discharged except for cause related to the performance of their assigned duties or violations of reasonable standard of conduct…."

113. As a result of his protected property interest, Plaintiff was entitled to reasonable notice of the allegations against him, including how he violated each of the policies set forth by Defendants.

114. Plaintiff also was entitled to a meaningful opportunity to respond, which required actual notice of the allegations and how his behavior violated policy.

115. Plaintiff also was entitled to a non-biased decisionmaker, instead of Bates, the person accusing him of the violation and to whom Plaintiff had reported violations of law and held personal bias against Plaintiff due to Plaintiff having to disclose his recordings of Bates promising to remove the verbal warning from Plaintiff's file when Bates refused.

116. In addition, Plaintiff was entitled to a post-termination hearing in which he had a fair opportunity to respond, call witness, and be represented by legal counsel, especially since he was not given notice how his actions violated the policies listed in his Due Process

Hearing letter.

117. Defendants violated Plaintiff's procedural due process rights by failing to provide (a) adequate notice of Plaintiff's violations of policy; (b) a meaningful opportunity to be heard; (c) an unbiased decisionmaker; and (d) a post-termination hearing where the full requirements of procedural due process could be provided.

118. As a direct and proximate result of Defendants' actions and/or failure to act, Plaintiff has suffered and will continue to suffer loss of earnings, benefits, and job opportunities, as well as emotional distress consisting of outrage, shock, and humiliation. Plaintiff is therefore entitled to general and compensatory damages, in an amount to be proven at trial, as well as any other equitable remedies available to him.

## COUNT VI
## VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT
**(Interference and Retaliation)**

119. Hatfield realleges and incorporates paragraphs 1 through 118 as though fully set forth herein.

120. Plaintiff was eligible for the protection of the FMLA.

121. Plaintiff has a serious medical condition for which he had ongoing treatment and medication.

122. Although Defendants were aware that Plaintiff was taking time off to deal with his own serious medical condition due to the light duty work Plaintiff could not perform, Defendants never advised him of his FMLA rights or protections.

123. Defendants were aware that Plaintiff had ongoing treatment for his back injury/medical condition and that his necessary leave for appointments and other absences due to his condition would be covered by FMLA leave.

124. Defendants interfered with Plaintiff's right to use FMLA leave for his own serious medical

condition by surveilling Plaintiff or participating in surveilling and terminating his employment.

125. Defendants retaliated against Plaintiff for using FMLA-qualified leave for his own serious medical condition by refusing to accommodate his need for leave and terminating his employment.

126. As a direct and proximate result of Defendants actions and/or failure to act, Plaintiff has suffered and will continue to suffer, a loss of earnings, employment benefits, and job opportunities. Plaintiff is thereby entitled to general damages, such amount to be proven at trial, plus interest, as well as any other equitable remedies available to him.

127. Defendants' actions and/or failures to act were committed in bad faith, for which Plaintiff is entitled to liquidated damages pursuant to 29 U.S.C. § 626(b).

## COUNT VII
## WRONGFUL TERMINATION IN
## VIOLATION OF PUBLIC POLICY

128. Hatfield realleges and incorporates paragraphs 1 through 127 as though fully set forth herein.

129. Plaintiff engaged in a protected activity when he reported his back injury, a work-related injury and disability, to his supervisor and filled out the first report of injury.

130. Hatfield's protected activities were a motivating factor in the County's decision to suspend and terminate his employment.

131. The County violated the public policy of the state of Idaho by its actions.

132. As a direct and proximate result of the County's actions and/or failures to act, Hatfield has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Plaintiff is therefore entitled to general and compensatory damages, such amount to be proven at trial, as well as other equitable remedies available to him.

## ATTORNEYS' FEES

133. As a further direct and proximate result of Defendants' actions and/or failures to act, Hatfield has been compelled to retain the services of counsel, and has thereby incurred and will continue to incur costs and attorney's fees which should be required to be paid by Defendants pursuant to Idaho Code §§12-117, and 12-121; *Hummer v. Evans, 923 P.2d 981 (Idaho S. ct. 1996),* 42 U.S.C. §12205; 29 U.S.C. § 2617(a)(3); 42 U.S.C. §1988; and 42 U.S.C. § 2000e-5(k), *et seq.*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues triable to a jury in this action.

## PRAYER FOR RELIEF

Plaintiff seeks the judgement of the Court against Defendants as follows:

1. For general and compensatory damages, and all other statutorily available damages, in an amount to be proven at trial;
2. For any equitable remedies available to him;
3. For liquidated damages;
4. For statutorily available costs and attorney's fees;
5. For prejudgment interest on all amounts claimed and;

For such other and further relief as the court deems just and proper.

DATED this 1st day of May 2023.

                                                 /s/
                                                 DeAnne Casperson, Esq.
                                                 CASPERSON ULRICH DUSTIN, PLLC