UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOSHUA HATFIELD,<br><br>Plaintiff,<br><br>v.<br><br>BONNEVILLE COUNTY, a political subdivision of the State of Idaho; and LANCE BATES, in his official and individual capacities,<br><br>Defendants. | Case No. 4:23-cv-00213-AKB-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court are Defendants Bonneville County and Lance Bates's Motion for Summary Judgment (Dkt. 59) and Plaintiff Joshua Hatfield's Motion for Partial Summary Judgment (Dkt. 60). Having reviewed the record and the parties' submissions, the Court finds that the parties have adequately presented the facts and legal arguments and that oral argument would not significantly aid the decisional process. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B); *see* also Fed. R. Civ. P. 78(b) ("By rule or order, the court may provide for submitting and determining motions on briefs, without oral hearings."). For the reasons below, the Court grants Defendants' motion and denies Hatfield's motion.

**INTRODUCTION**

This case arises from Bonneville County's decision to terminate Hatfield after he reported a workplace back injury, received workers' compensation benefits, was placed on medical restrictions, and was captured on surveillance videos violating those restrictions. Defendants contend the County terminated Hatfield because he engaged in farmwork that violated his

restrictions and his treating physician, who reviewed the surveillance, released Hatfield to full duty. According to Defendants, the County terminated Hatfield based on a good-faith belief that he exaggerated his injury, violated his restrictions, and was dishonest in connection with his workers' compensation claim.

Hatfield tells a different story. He contends that the County was biased against him based on his prior complaint about a co-worker; he disclosed to the County that he needed to cut his hay before the surveillance occurred; he inquired whether workers' compensation would pay someone else to cut his hay for him; and after he was told it would not, a human resources employee for the County told him that "you need to do whatever is best." According to Hatfield, the surveillance did not reveal misconduct; rather, it captured an activity about which the County already knew, and he was "set up" by the County.

## BACKGROUND

### A.   Employment and Prior Workplace Complaint

Hatfield began working for the County in August 2018 as a full-time truck driver (Dkt. 62-2 at 6 (Hatfield Dep. 26:9-13)). In August 2021, he submitted a written complaint about the alleged workplace misconduct of his co-worker, Casey Powell, and Hatfield later attended a meeting about that complaint on August 11, 2021, with Powell and other County personnel, including a human resource employee, Melinda Wallace, and Hatfield's supervisors, Ken Ray and Lance Bates (Dkt. 62-3 at 1-2 (Hatfield Decl. ¶ 3); Dkt. 62-3 at 6-7 (8/11/21 Tr. at 2:13-3:41)). As a result of Hatfield's complaint, Powell received a written warning, and Hatfield received a verbal warning (Dkt. 62-3 at 7 (8/11/21 Tr. at 3:23-3:41, 6:03-6:17)).

In April 2022, Hatfield demanded that Ray destroy the verbal warning (Dkt. 62-2 at 9 (Hatfield Dep. 45:13-46:25)). Hatfield testified that Ray told him that Bates would not permit the

MEMORANDUM DECISION AND ORDER - 2

warning to be destroyed until a year had passed; Hatfield then confronted Bates and told him he would take his concerns to the County Commissioners if the warning was not destroyed (Dkt. 62-2 at 9-10 (Hatfield Dep. 46:15-50:18)). Ultimately, Ray destroyed the warning (Dkt. 62-2 at 10 (Hatfield Dep. 50:12-18, 26:16)) (explaining K.R. is Ray).

**B.      Injury, Restrictions, Surveillance, and Medical Review**

About a year after Hatfield complained about Powell, Hatfield alleges he injured his back while climbing into his work truck or pup trailer and lifting an oil or diesel can (Dkt. 62-2 at 13-14 (Hatfield Dep. 75:13-78:8)). Hatfield reported the injury to his supervisor, Wes Parker, on Tuesday, August 30, 2022 (Dkt. 59-8). However, another County employee, Donald Green, reported that Hatfield had told him before work began on Monday, August 29, that Hatfield had "messed his back up" (Dkt. 62-2 at 85 (Green Dep. 21:1-24; *see also* Dkt. 59-4)). Based on this timing, Green assumed Hatfield had injured his back over the weekend (*id.*). Hatfield disputes the reliability of Green's statement because Green signed a written statement at the County's request after the County terminated Hatfield (Dkt. 62-2 at 85 (Green Dep. 21:1-6, 23:5-7)).

Hatfield first sought medical treatment for his back injury on September 6, 2022 (Dkt. 59-7 at 4). He was diagnosed with a low-back sprain, prescribed medication, referred for further evaluation, and issued work restrictions which included no bending; lifting limitations; and rest periods from driving, sitting, standing, or related activity (*id.*). Hatfield worked in a modified capacity after receiving these September 6 restrictions; he contends, however, that he told the County the long driving days and rough-terrain work increased his pain (Dkt. 59-3 at 48-49 (Ray Dep. 84:3-17, 85:8-12, 88:2-10); Dkt. 62-3 at 2-3 (Hatfield Decl. ¶¶ 7, 9); Dkt. 62-2 at 18 (Hatfield Dep. 101:1-103:17)).

MEMORANDUM DECISION AND ORDER - 3

On September 12, 2022, Hatfield contacted Wallace in human resources and reported significant pain (Dkt. 62-3 at 2-3). Wallace told him to seek medical treatment if he was in serious pain (Dkt. 59-3 at 29 (Wallace Dep. 81:4-82:18)). Hatfield also states Wallace cancelled or altered his orthopedic appointment[1] and told him that "your body belongs to me" and that "you will do everything I say" (Dkt. 62-1 at ¶ 30; Dkt. 62-2 at 15 (Hatfield Dep. 91:17-92:6); Dkt. 62-3 at 2 (Hatfield Decl. ¶ 7)).

The County processed Hatfield's injury report through workers' compensation (Dkt. 59-2 at 4-5; Dkt. 59-1 at 5). Around September 12, 2022, Wallace communicated with Morgan Weigel of Intermountain Claims about Hatfield's workers' compensation claim, his personal business outside of his County employment, and the possibility of surveilling him (Dkt. 62-2 at 75, 78-79 (Wallace Dep. 49:12-51:8, 61:5-18, 73:1-74:7); Dkt. 59-7 at 14-15).

On September 20, 2022, Hatfield saw a nurse practitioner, Colter Johnson, who revised Hatfield's medical restrictions (Dkt. 59-7 at 7). These restrictions included that Hatfield "May NOT return to work pending further evaluation" and "No Bending," "No Squatting," "No lifting more than 6 -10 pounds," "No Prolonged Sitting," and "No Prolonged Walking" (Dkt. 60-4 at 14; *see also* Dkt. 59-7 at 7). The following day, September 21, Dr. Lynn Stromberg treated Hatfield and noted that Hatfield's symptoms were "somewhat out of proportion to the mechanism," observed Hatfield getting into his car without apparent discomfort, but continued Hatfield's restrictions pending an MRI (Dkt. 59-7 at 9).

---

[1] Hatfield does not provide any specific facts to support his allegation that Wallace canceled or altered his appointment (*see* Dkt. 62-1 at ¶ 3) (claiming Wallace canceled his appointment with another orthopedist"). For example, he does not state when or with whom the appointment was scheduled.

MEMORANDUM DECISION AND ORDER - 4

According to Hatfield, sometime in mid-September, he told Wallace and Weigel that he needed to cut his hay and asked whether workers' compensation "could pay to get his hay cut" (Dkt. 62-1 at ¶ 34; Dkt. 62-2 at 29 (Hatfield Dep. 154:14-156:4)). Weigel told him that workers' compensation would not assist him, and Wallace told him "you need to do whatever you think is best" (*id.*).Then, on September 21, 2022—the same day that Dr. Stromberg continued Hatfield's medical restrictions—Weigel contacted M3 Investigations about conducting surveillance of Hatfield (Dkt. 59-7 at 17 -18). Weigel provided M3 Investigations with Hatfield's information, stating that he was off work, had "another side business cutting firewood," could not lift more than ten pounds, and was restricted from bending, squatting, and prolonged sitting, standing, or walking (Dkt. 59-7 at 14). The email did not state that Hatfield would in fact be cutting firewood or engaging in any other specific activity on any particular day (Dkt. 59-7 at 14; Dkt. 64 at 4-5).

M3 Investigations surveilled Hatfield on September 23 and 24 (Dkt. 59-7 at 15 -18).[2] Its report describes Hatfield as engaging in farming activity, including using farm equipment to cut hay, despite his medical restrictions (Dkt. 59-5 at 6-13). Further, the report describes Hatfield's physical activities as obtaining fuel, appearing at an alfalfa field with his son and a self-propelled windrower, checking equipment, bending, climbing, lifting and pouring a five-gallon gas can, operating the windrower, using a large wrench, and using a truck and recovery straps after the windrower became stuck in mud (*id.*). Defendants characterize the September 24 activity as approximately six hours of cutting thirty acres of hay (Dkt. 59-2 at 6; Dkt. 59-1 at 6). Hatfield does

---

[2]     M3 Investigations' report identifies Intermountain Claims as its client and Weigel as its client contact, and there is no evidence that the County directly retained or paid M3 Investigations (Dkt. 59-5 at 4-5; Dkt. 62-2 at 53 (Bates Dep. 65:2-67:13); Dkt. 62-2 at 75, 78-79 (Wallace Dep. 49:12-51:8, 61:5-18, 73:1-74:7); Dkt. 59-7 at 13-15).

**MEMORANDUM DECISION AND ORDER - 5**

not dispute that he cut hay, but he disputes that his conduct showed he intentionally violated his restrictions or fabricated his injury (Dkt. 62-3 at 68-73 (10/17/22 Tr. at 2:08-19:17)).

Later, on September 27, 2022, Dr. Stromberg reviewed Hatfield's MRI, noted desiccation and a minimal L5-S1 bulge, but stated that those findings were below the area about which Hatfield complained and that the MRI did not show instability, herniation, or another spinal etiology explaining Hatfield's symptoms (Dkt. 59-7 at 19). Dr. Stromberg released Hatfield to sedentary duty because "[t]he MRI scan simply doesn't show anything in this region that is of concern" and because he did not "see any target for intervention or further investigation" (Dkt. 59-7 at 19-20; Dkt. 62-3 at 64-66). That same day, M3 Investigations emailed Weigel two surveillance videos; Weigel forwarded the materials to Wallace; and Wallace forwarded them to the County's human resources director, John Henderson (Dkt. 59-7 at 11-12). The record separately contains M3 Investigations' written surveillance report (Dkt. 59-5 at 4-13), although how the County received the report is unclear.

Sometime before Hatfield's October 4, 2022, follow-up appointment with Dr. Stromberg, Dr. Stromberg reviewed M3 Investigations' surveillance materials (Dkt. 59-7 at 23). Dr. Stromberg's notes from the October 4 appointment state that the video shows Hatfield running a swather, buying fuel, getting up and down to unjam the machine, and pulling with a large crescent wrench (*id.*). Dr. Stromberg told Hatfield, if he could do those things, it appeared he could return to work (*id.*). Because Dr. Stromberg did not "see any objective evidence of injury," he released Hatfield to "regular work duties without restrictions" (*id.*).

## C.     Accommodation and Leave-Related Events

After Hatfield was initially subject to medical restrictions September 6, 2022, the County continued assigning Hatfield modified work. Hatfield's restrictions at that time included lifting or

MEMORANDUM DECISION AND ORDER - 6

carrying only six to ten pounds; no bending; and rest periods from driving, sitting, or standing due to back pain (Dkt. 59-7 at 4). Hatfield was assigned to the patch truck to haul material, and he was told not to shovel or rake and that he could take extended breaks (Dkt. 59-3 at 48-49 (Ray Dep. 84:3-17, 85:8-12, 88:2-10)). Hatfield testified that the long driving days and rough terrain aggravated his pain (Dkt. 62-2 at 18 (Hatfield Dep. 101:1-103:17); Dkt. 62-3 at 3 (Hatfield Decl. ¶ 9)). Wallace told Hatfield to seek further medical care (Dkt. 59-3 at 29 (Wallace Dep. 81:4-82:18)); and as previously noted, Hatfield saw Johnson on September 20 and received revised restrictions, including the restriction that he was not to return to work pending results of his MRI (Dkt. 59-7 at 7).

After Dr. Stromberg reviewed the MRI and released Hatfield to sedentary duty on September 27, 2022, Wallace identified a possible light-duty assignment at the "Hatch Pit," which is a landfill. Defendants stated the position did not require Hatfield to climb onto vehicles for inspections and instead would require him to answer phones or speak through a window (Dkt. 59-3 at 30 (Wallace Dep. 100:6-20)). The County provided Hatfield with a "Temporary Light Duty Offer Letter" on September 28, stating that the County could accommodate Hatfield's restrictions at the Hatch Pit, instructing him to work within his restrictions, and directing him to contact Wallace if a task required exceeding the restrictions (Dkt. 62-2 at 123). Hatfield, however, declined the assignment, writing that he wanted to speak with Weigel (*id*.). Hatfield testified that he believed the Hatch Pit assignment would require physical activities outside his restrictions, including bending, moving, and climbing in vehicles (Dkt. 62-2 at 19 (Hatfield Dep. 106:8-107:24); Dkt. 62-3 at 3 (Hatfield Decl. ¶ 12)).[3]

---

[3]   Hatfield also relies on an apparent hearsay statement from a Hatch Pit supervisor regarding whether the work was within Hatfield's restrictions. Hatfield provides no foundation to establish

**MEMORANDUM DECISION AND ORDER - 7**

On September 30, 2022, the County gave Hatfield another temporary assignment converting the County safety manual from PDF to a Word document by re-typing it (Dkt. 62-1 at ¶ 50; Dkt. 62-2 at 124; Dkt. 62-2 at 20 (Hatfield Dep. 109:1-110:20); Dkt. 62-3 at 3 (Hatfield Decl. ¶ 13)). The County's written offer again stated the County could accommodate Hatfield's restrictions and instructed him to work within them (Dkt. 62-2 at 124). Hatfield accepted the typing assignment only "as long as" he could tolerate the work with his pain; began the assignment on October 3; stated that the workstation and chair aggravated his back pain; and left work after approximately two and one-half hours (Dkt. 62-2 at 124; Dkt. 62-2 at 19-21 (Hatfield Dep. 105:2-20, 109:1-113:13); Dkt. 62-3 at 3 (Hatfield Decl. ¶ 13)).

**D.     Due Process Notice, Hearing, and Termination**

Defendants do not dispute that Hatfield had a protected property interest in his County employment (Dkt. 61 at 2). Bonneville County Employee Handbook Progressive Discipline Policy 716 governs the County's pretermination due process procedure, and Hatfield acknowledged he received the Handbook (Dkt. 60-4 at 15). Policy 716 provides that a pretermination hearing is informal and generally should not exceed one hour (Dkt. 60-3 at 147). Further, it provides that the employee may present oral testimony, witness statements, and other documents; may be assisted by an attorney or other representative; and may present evidence that "the actual reason for the proposed action, although not stated, is unlawful" (*id.*).

On October 11, 2022, the County issued Hatfield a Due Process Hearing Form, notifying him of a proposed termination (Dkt. 60-4 at 14-15). The notice identifies the September 20 restrictions and stated that "video surveillance" from September 23 and 24 "clearly shows"

---

that such statement would be admissible at trial, and the Court does not consider it to the extent Hatfield offers it for the truth of the matter it asserts.

MEMORANDUM DECISION AND ORDER - 8

Hatfield violating the restrictions (*id*. at 14). It describes the alleged violation as "willful and intentional" and lists numerous sections of the Employee Handbook, including business ethics and conduct, workers' compensation insurance, sick leave benefits, employee time records, safety, work schedules, leave without pay, and employee conduct and work rules (*id.*). Although Bates was the "County Representative" proposing that Hatfield potentially be terminated and he acknowledged identifying the Employee Handbook sections listed in the notice, the County's human resources director, Henderson, wrote the notice's narrative (Dkt. 60-3 at 15 (Bates Dep. 29:16-30:9); Dkt. 60-3 at 14 (Bates Dep. 13:6-21)).

The County initially scheduled the pretermination hearing for October 14, 2022, but it rescheduled the hearing for October 17 after Hatfield requested additional time (Dkt. 60-4 at 14-17). Hatfield appeared at the hearing before Bates, Ray, and Henderson (Dkt. 62-3 at 69 (10/17/22 Tr. at 2:15-3:31)). At the beginning of the hearing, Henderson told Hatfield the hearing was his opportunity to explain his side of the story before the County made a final decision (Dkt. 62-3 at 69 (10/17/22 Tr. at 2:08-2:58)). When Hatfield asked how the listed Employee Handbook sections related to the alleged violation of his medical restrictions, Bates stated: "I looked through the employee manual and thought about what those different sections could be. And so to be comprehensive, I put down where those sections could possibly tie back into the violation of workers comp" (Dkt. 62-3 at 70 (10/17/22 Tr. at 5:58-6:34)). That was the only substantive comment Bates made during the hearing (*see generally* Dkt. 62-3 at 69-73).

At the hearing, the County did not present witnesses or evidence (Dkt. 60-3 at 15-16 (Bates Dep. 32:24-33:1)). Hatfield acknowledged he cut hay but disputed that he intentionally violated his medical restrictions (Dkt. 62-3 at 70-72 (10/17/22 Tr. at 6:34-17:35)). He stated that he needed to cut hay; workers' compensation would not pay someone else to cut it for him; his son helped

MEMORANDUM DECISION AND ORDER - 9

him; he took pain medication to perform the work; and no one told him his restrictions applied to his off duty farmwork (*id.*). Further, he argued that the County required him to perform work which he believed violated his restrictions (*id.*). Hatfield also relied on his MRI and employment history to dispute the County's view that he had fabricated his condition or violated any policies (Dkt. 62-3 at 72 (10/17/22 Tr. at 12:26-17:35)). At the end of the hearing, Henderson stated that the hearing had given the County "more information" and that "before we make a final decision," the County needed to "get [Hatfield's] side of the story and hear [him] out" (Dkt. 62-3 at 72-73 (10/17/22 Tr. at 18:22-18:36)).

Bates testified that after the hearing, Henderson and he spoke with the County's legal counsel and the County Commissioners to discuss what they had learned (Dkt. 60-3 at 15 (Bates Dep. 30:15-31:8)). Further, Bates testified that the Commissioners wanted him to make the final recommendation and that Hatfield was terminated based on that recommendation (Dkt. 60-3 at 15 (Bates Dep. 31:1-8)). Bates also characterized his role as recommending whether to proceed with the action (Dkt. 60-3 at 18 (Bates Dep. 147:2-14)). Henderson testified that Bates made the termination decision and that Henderson understood the Commissioners had left the decision to Bates (Dkt. 60-3 at 24 (Henderson Dep. 96:13-23)). Ray testified the final decision was up to Bates and that Henderson and Ray did not have a say whether Hatfield would be terminated (Dkt. 60-3 at 30 (Ray Dep. 126:21-127:8)).

Bates testified that, before the due-process hearing, he drafted a termination letter so he could discuss options with Henderson (Dkt. 60-3 at 17 (Bates Dep. 105:11-16)). He acknowledged the draft was a termination letter; denied that he had already made up his mind; and testified that the hearing outcome could have been something other than termination (Dkt. 60-3 at 17 (Bates

Dep. 105:17-106:15)). Later, Bates terminated Hatfield over the phone, but Henderson signed the final November 4, 2022, termination letter (Dkt. 60-4 at 17).

Hatfield did not receive a post-termination hearing (Dkt. 60-3 at 15-16 (Bates Dep. 31:9-18, 33:8-10)). Bates testified that he believed Policy 716 provided for one hearing and that "there was no second hearing ever mentioned" (*id*.). After termination, Hatfield's workers' compensation claim was referred to the Idaho Department of Insurance for suspected fraud (Dkt. 62-2 at 134-36). Although the Department acknowledged that the surveillance of Hatfield showed him violating his medical restrictions, it concluded that the evidence was insufficient to prove he was faking his injury (*id*.).

Hatfield sues both the County and Bates. He alleges violations of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*, and the Idaho Human Rights Act (IHRA), Idaho Code §§ 67-5901–5912, for disability discrimination (Count I),[4] failure to accommodate (Count II), and retaliation (Count III); a violation of the Idaho Protection of Public Employees Act (IPPEA), Idaho Code §§ 6-2101–2109 (Count IV); a claim under 42 U.S.C. § 1983 for violation of his procedural due process rights (Count V); violations of the Family Medical Leave Act

---

[4]      Because the same ADA analysis applies to the IHRA, the Court refers only to the ADA in addressing Hatfield's claims under both statutes. *See, e.g.*, *Johnson v. Bd. of Trustees of Boundary County Sch. Dist. No. 101*, No. CV-09-61-N-BLW, 2010 WL 530070, at *7 (D. Idaho Feb. 9, 2010).

**MEMORANDUM DECISION AND ORDER - 11**

(FMLA), 29 U.S.C. §§ 2601–2654, for interference and retaliation;[5] and a state common law claim for wrongful termination in violation of public policy (Count VII) (*see generally* Dkt. 1).[6]

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986). The trial court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. County of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, the court must "view[ ] the facts in the non-moving party's favor." *Id.* To defeat a motion for summary judgment, the nonmoving party must present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor." *Id.* (citation omitted).

The trial court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party cannot simply rely on unsworn assertions or the pleadings to defeat a motion for

---

[5]    Hatfield jointly alleges a claim for retaliation and interference under the FMLA (Dkt. 1 at ¶¶ 119-27). The Court, however, liberally construes Hatfield's complaint as alleging separate claims for each and considers his FMLA retaliation claim as opposing an unlawful practice under 29 U.S.C. § 2615.

[6]    Hatfield alleges all his claims against both his employer, the County, and Bates. In moving for summary judgment, Defendants do not challenge any claims as improperly asserted against Bates, who is not Hatfield's employer. For this reason, the Court does not address whether each of Hatfield's claims are properly brought against Bates. That the Court does not do so, however, should not be construed as a ruling that all Hatfield's claims are properly asserted against Bates.

MEMORANDUM DECISION AND ORDER - 12

summary judgment; rather, the nonmoving party must set forth the "specific facts," supported by evidence, with "reasonable particularity" that preclude summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

Where parties file cross-motions for summary judgment on the same issue, the Court considers each motion on its own merits and reviews all evidence submitted by both parties. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Cross-motions do not by themselves establish that no genuine dispute of material fact exists. *Id.*

## ANALYSIS

### A.    Analytical Framework

For purposes of summary judgment, Defendants do not dispute that Hatfield has established a prima facie case for certain claims. Instead, they argue Hatfield has failed to meet his burden of proving the County's legitimate reason for discharging him was pretextual under the *McDonnell Douglas*[7] burden-shifting analysis. Defendants rely on this argument to challenge Hatfield's claims under the ADA, FMLA, and the IPPEA (Dkt. 59-1 at 2). In doing so, however, Defendants fail to distinguish the various theories upon which Hatfield relies to assert these claims or to cite authority that courts analyze all these claims under *McDonnell Douglas* (*see generally* Dkt. 1) (asserting claims under ADA for disability discrimination, retaliation, and failure to accommodate and under FMLA for his retaliation and interference claims).

Hatfield argues that his retaliation claims must be "analyzed separately"; specifically, he focuses on his retaliation claims under the IPPEA claim and the ADA (Dkt. 62 at 2-9). Hatfield is partially correct. Courts have disagreed whether *McDonnell Douglas* applies to IPPEA claims.

---

[7]    *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

**MEMORANDUM DECISION AND ORDER - 13**

*Compare Berrett v. Clark Cnty. Sch. Dist. No. 161*, 682 F. App'x 623, 624 (9th Cir. 2017) (unpublished) (noting *McDonnell Douglas* burden-shifting analysis does not apply on summary judgment to IPPEA) *with Summers v. City of McCall*, 84 F. Supp. 3d 1126, 1137-38 (D. Idaho 2015) (noting conflict among courts and concluding *McDonnell Douglas* burden shifting analysis applies on summary judgment to IPPEA retaliation claim); *see also Brown v. City of Caldwell*, No. 1:10-cv-536-BLW, 2012 WL 892232, at \*7 (D. Idaho Mar. 14, 2012) (noting *McDonnell Douglas* burden shifting is a federal procedural rule applicable to state claims).

Whether *McDonnell Douglas* applies to an ADA claim for failure to accommodate is also unclear. District courts in the Ninth Circuit appear to disagree about its application. *Compare Siriah v. U. of Hawaii*, Civ. No. 24-00417-SASP-RT, 2024 WL 4981023, at \*3 (D. Haw. Nov. 30, 2024) (applying *McDonnell Douglas* analysis to conclude allegations fail to state claim for failure to accommodate) *with Kelley v. Amazon.com, Inc.*, No. 12-CV-5132-TOR, 2013 WL 6119229, at \*3 (E.D. Wash. Nov. 21, 2013), *aff'd*, 652 F. App'x 524 (9th Cir. 2016) ("Failure to accommodate claims are not analyzed under the familiar *McDonnell Douglas* burden shifting framework because liability does not 'turn on the employer's intent or actual motive.'"). Further, the Ninth Circuit has declined to apply the *McDonnell Douglas* analysis to FMLA interference claims. *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011) (declining to apply *McDonnell Douglas* burden shifting to FMLA interference claims)

The Ninth Circuit, however, applies the *McDonnell Douglas* analysis to both retaliation and disability discrimination claims under the ADA. *Curley v. City of North Las Vegas*, 772 F.3d 629, 632 (9th Cir. 2014) ("Discrimination and retaliation claims under the ADA are both subject to the burden-shifting framework outlined in *McDonnell Douglas*[]."). Further, the Ninth Circuit has applied the analysis to FMLA retaliation claims. *Alcozar-Murphy v. Asarco LLC*, 744 F. App'x

**MEMORANDUM DECISION AND ORDER - 14**

411, 412 (9th Cir. 2018) (concluding district court did not err in concluding plaintiff failed to prove reason for termination was pretextual) (citing *Sanders*, 657 F.3d at 777 & n.3) (discussing application of *McDonnell Douglas* burden-shifting framework to FMLA retaliation claim).

In summary, the *McDonnell Douglas* burden-shifting analysis does not apply to an FMLA interference claim. It is unclear whether the analysis applies to an ADA failure to accommodate claim and an IPPEA claim. The analysis does apply, however, to claims under the ADA for disability discrimination and for retaliation claims under both the FMLA and ADA. Accordingly, the Court assumes, as Defendants do, that Hatfield has established a prima face case for those claims to which the burden-shifting analysis clearly applies—Hatfield's disability discrimination claim under the ADA and his retaliation claims under the ADA and FMLA—and it addresses whether Hatfield failed to show the County's reason for terminating him was pretextual in the context of those claims. The Court addresses Hatfield's other claims independently because either that the *McDonnell Douglas* analysis does not apply or the law is conflicting whether it applies.

**B.      Defendants' Stated Reason and Hatfield's Pretext Theories**

Under the *McDonnell Douglas* burden-shifting analysis, Defendants have articulated a legitimate nondiscriminatory, nonretaliatory reason for terminating Hatfield's employment: the County believed Hatfield exaggerated or misrepresented his workers' compensation injury, was dishonest about his physical limitations, and violated his medical restrictions. The evidence supports this stated reason. By the time the County issued the proposed termination notice, it was aware of Hatfield's medical restrictions, M3 Investigations' surveillance materials showing Hatfield performing farmwork contrary to the restrictions, and Dr. Stromberg's opinions that there was no "objective evidence of injury" and that Hatfield could return to "regular work duties without restrictions" (Dkt. 59-7 at 14-15, 23; Dkt. 60-4 at 14). This proof shifts the burden to

Hatfield to show the County's stated reason was pretextual. The Court, however, concludes that Hatfield has failed to raise a genuine dispute of material fact of pretext.

Hatfield's theory that the County implicitly approved his farming activities does not create a genuine material fact. For purposes of summary judgment, the Court accepts Hatfield's testimony that he disclosed the need to cut his hay to Wallace and Weigel before M3 Investigations surveilled him (Dkt. 62-2 at 24, 29 (Hatfield Dep. 127:11-25, 154:14-156:4)). That testimony, however, only shows that Hatfield asked whether the County or workers' compensation would pay him to have the hay cut and that he was told it would not and to do what he thought was best. Contrary to Hatfield's assertion, that Hatfield disclosed the need to cut hay to the County does not show that the County knew Hatfield intended to perform the farmwork himself, knew where he would be on September 23 or 24 when he was surveilled, selected those surveillance dates, instructed M3 Investigations to watch for hay cutting, or gave Hatfield permission to violate his medical restrictions. Rather, the record shows M3 Investigations identified September 23 and 24 as available dates; Weigel scheduled surveillance for those dates; Wallace told Weigel she would not tell Ray or Bates when surveillance would occur; and the information provided to M3 Investigations referred to a firewood side business, not hay (Dkt. 59-7 at 14-15; Dkt. 62-2 at 79 (Wallace Dep. 73:1-74:7)). Contrary to Hatfield's assertion, the record does not show that the County set Hatfield up to be caught on surveillance.

Further, the record does not support Hatfield's assertion that the County somehow approved his off-duty farmwork. A reasonable jury could not conclude that Wallace's statement that Hatfield should do what he thought was best was permission to violate the restrictions imposed by his medical care providers. The record does not support this conclusion. Moreover, Hatfield's argument that he was not bound by his medical restrictions except during County work hours is

**MEMORANDUM DECISION AND ORDER - 16**

unpersuasive. The restrictions were limitations on Hatfield's physical condition, not workplace rules applicable only while he was performing County work. Nothing in the record suggests the County had authority to excuse compliance with those restrictions, told Hatfield he could disregard them, or reasonably understood the restrictions to apply only during County work hours.

Hatfield's broader circumstantial theory also does not create a factual issue regarding the County's stated reason for his termination. Hatfield argues that County personnel were immediately skeptical of his injury or workers' compensation claim, assigned work he believed aggravated his pain, failed to accommodate him, and was motivated by his earlier conflict with Powell. Those facts, however, do not show that the County's reliance on Hatfield's medical restrictions, M3 Investigations' surveillance materials, and Dr. Stromberg's full-duty release was disingenuous or pretextual. Further, Hatfield's credibility challenges do not establish pretext absent evidence that the County's stated reason for his termination is unworthy of credence or that unlawful discrimination or retaliation more likely motivated the decision. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062-63 (9th Cir. 2002) (rejecting credibility challenges as basis for establishing pretext).

Because Hatfield has failed to meet his burden of showing that the County's stated reason for termination of his employment was pretextual, Defendants are entitled to summary judgment on Hatfield's claims for disability discrimination under the ADA and for retaliation under the ADA and the FMLA.

## C.     Claims Not Governed by McDonnell Douglas

### 1.     ADA Failure to Accommodate

Hatfield alleges the County failed to reasonably accommodate him under the ADA. To survive summary judgment on a failure-to-accommodate claim, a plaintiff must identify a

reasonable accommodation that was available and would have enabled him to perform the essential functions of the position. *Dark v. Curry County*, 451 F.3d 1078, 1088 (9th Cir. 2006). Once an accommodation is requested, the employer must engage in an interactive process requiring direct communication, consideration of the employee's request, and offering an accommodation that is reasonable and effective. *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002). That duty may continue beyond the first attempted accommodation when the employer knows the initial accommodation is failing and further accommodation is needed. *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1138 (9th Cir. 2001). Liability for failure to accommodate or failure to engage in the interactive process, however, requires a showing that a reasonable accommodation was possible and would have been possible. *See Dark*, 451 F.3d at 1088; *Zivkovic*, 302 F.3d at 1089-90.

Here, the record does not support a failure-to-accommodate claim. After the September 6 restrictions, the County kept Hatfield working with modified duties (Dkt. 59-3 at 48-49 (Ray Dep. 84:3-17, 85:8-12, 88:2-10)). After the September 27 sedentary-duty release, the County issued two written temporary light-duty offers. Both stated the County could accommodate Hatfield's restrictions, instructed him to work within his restrictions, and directed him to contact Wallace if any task would require him to exceed them (Dkt. 62-2 at 123). Hatfield declined the first offer at the Hatch Pit (*id.*).

In response, the County offered Hatfield another accommodation, re-typing a safety manual (Dkt. 62-1 at ¶ 50). Hatfield accepted this position only "as long as" he could tolerate the assignment with his pain (Dkt. 62-2 at 124). The record shows that the County told Hatfield his typing speed did not matter, allowed him breaks, and offered him other chairs after he complained (Dkt. 59-3 at 41-42 (Bates Dep. 93:11-99:8); Dkt. 62-2 at 123-24). Hatfield began the assignment

on October 3, 2022, but left work after approximately two and one-half hours, claiming the position aggravated his pain (Dkt. 62-1 at 8-9; Dkt. 62-2 at 19-21 (Hatfield Dep. 105:2-20, 109:1-113:13); Dkt. 62-3 at 3 (Hatfield Decl. ¶ 13)). The next day, October 4, Dr. Stromberg released Hatfield to full duty (Dkt. 59-7 at 23).

Although Hatfield may not have viewed the typing assignment as a reasonable accommodation, Hatfield fails to identify a reasonable accommodation that was available and would have enabled him to perform the essential functions of the position. *See Dark*, 451 F.3d at 1088 (requiring plaintiff to identify available reasonable accommodation). For example, he does not identify any accommodation he requested or any vacant position, light-duty assignment, workstation modification, or other accommodation the County refused to provide him (Dkt. 60-4 at 14-15). On this record, the Court concludes Hatfield has not identified a reasonable accommodation that the County denied him and that would have enabled him to perform the essential functions of his position. Accordingly, Defendants are entitled to summary judgment on Hatfield's claim under the ADA that the County failed to accommodate him.

### 2.     FMLA Interference

Hatfield alleges Defendants interfered with his right to use FMLA leave. To make out a prima facie case of FMLA interference, an employee must establish that: "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1243 (9th Cir. 2014) (quoting *Sanders*, 657 F.3d at 778). A plaintiff also must show prejudice. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002). An employee need

not expressly invoke the FMLA, but the record must show notice of a need for FMLA-qualifying leave. *Escriba*, 743 F.3d at 1243-44.

For purposes of summary judgment, the Court assumes Hatfield had a serious health condition, as defined by 29 U.S.C § 2611(11), and that the County knew about that condition. Regardless, Hatfield's claim fails because he has not identified any FMLA benefit that the County denied him or any resulting prejudice. For example, nothing in the record shows that Hatfield requested medical leave which the County refused; the County prevented him from attending medical appointments or taking needed time off; or he would have taken additional leave if the County had designated his absences as FMLA leave; or he lost any other FMLA protections. Accordingly, Hatfield has not shown that the County caused him prejudice by failing to provide FMLA notices, to designate his leave as FMLA leave, or to otherwise process his leave as FMLA leave. Because Hatfield has failed to establish a prima facie case of interference under the FMLA, Defendants are entitled to summary judgment on that claim.

### 3.    Idaho Protection of Public Employees Act

Hatfield alleges the County took adverse action against him in violation of the IPPEA, which is also known as Idaho's "Whistleblower Act." The IPPEA provides "a legal cause of action for public employees who experience adverse action from their employer as a result of reporting waste and violations of a law, rule or regulation." Idaho Code § 6-2101. To establish a prima facie claim under the IPPEA, a plaintiff must show that he was an employee who engaged or intended to engage in protected activity; his employer took adverse action against him; and a causal connection exists between the protected activity and the adverse action. *Van v. Portneuf Med. Ctr., Inc.*, 330 P.3d 1054, 1059 (Idaho 2014).

**MEMORANDUM DECISION AND ORDER - 20**

In support of his IPPEA claim, Hatfield relies primarily on his August 2021 complaint about his co-worker, Powell, and his dispute with his supervisors regarding his related April 2022 verbal warning (Dkt. 62 at 7). The IPPEA, however, does not protect every internal workplace complaint. Rather, a protected communication must objectively concern waste or a violation (or suspected violation) of a law, rule, or regulation. Hatfield's August 2021, letter complaining about Powell does not satisfy this requirement.

In that letter, Hatfield complained that Powell engaged in "misbehavior, harassment, lack of professional conduct, and complete disregard for authority and his fellow co-workers," and he described Powell's verbal abuse, intimidation, threats, reckless driving, and other workplace conduct (Dkt. 62-2 at 130-32). The letter identifies two purported violations. Neither, however, is sufficient to establish a prima facie case under the IPPEA.

First, Hatfield's letter relies on the County's Employee Handbook and asserts Power violated Sections 701 and 703 regarding employee conduct and the work environment, respectively (*id.* at 132). An employer's internal administrative policies, however, are distinct from laws, rules, and regulations, and the Idaho Supreme Court has held that "a policy violation does not fall within the protective scope of the Whistleblower Act." *Eller v. Idaho State Police*, 443 P.3d 161, 174 (Idaho 2019). Accordingly, Hatfield's claim that Powell violated the Employee Handbook is not a protected activity under the IPPEA.

Second, Hatfield's letter purports to rely  on the Idaho Legislature's definition of "workplace harassment." Although the IHRA does not define this term, Hatfield apparently refers to the IHRA. *See generally*, Idaho Code § 67-5902 (providing definitions). Notably, however, a claim for workplace harassment under the IHRA is limited to conduct based on race, color, religion, sex, national origin, or disability. Idaho Code § 67-5901(2). Hatfield's letter, however,

does not allege that Powell harassed Hatfield because of any protected status. Further, it does not otherwise allege facts tying Powell's conduct to a legally cognizable harassment claim. Instead, the letter describes Powell's hostile, threatening, and unsafe conduct toward Hatfield and other employees. Although those allegations may support an internal workplace complaint, they do not provide an objectively reasonable basis to believe Powell violated Idaho's harassment laws.

This distinction is dispositive. An employee's subjective belief that conduct is improper is not enough; rather, a suspected violation must be objectively reasonable to qualify as a protected activity under the IPPEA. *Cryer v. Idaho Dep't of Labor*, 332 F. Supp. 3d 1260, 1271-72 (D. Idaho 2018). Because Hatfield's asserted harassment theory is not based on his protected status and because *Eller* forecloses his reliance on violations of the County's Employee Handbook, the IPPEA does not cover Hatfield's complaints about Powell. Accordingly, Hatfield has failed to show he was engaged in a protected activity and to establish a prima facie case under the IPPEA, and Defendants are entitled to summary judgment on that claim.

### 4.        Wrongful Discharge in Violation of Idaho Public Policy

Hatfield alleges wrongful discharge in violation of Idaho public policy. Idaho recognizes a narrow exception to the at-will employment doctrine when the employer's motivation for termination contravenes public policy.[8] *Jackson v. Minidoka Irrigation Dist.*, 563 P.2d 54, 57 (Idaho 1977); *Sorensen v. Comm Tek, Inc.*, 799 P.2d 70, 74 (Idaho 1990). Protected activities may include refusing to commit an unlawful act, performing an important public obligation, or exercising certain legal rights and privileges. *Bollinger v. Fall River Rural Elec. Co-op., Inc.*, 272

---

[8]        Hatfield was not at-will because he had a protected interest in his County employment. Neither party addresses this issue. The Court assumes, without deciding, that an employee with a property interest in his employment has the same interest as an at-will employee in not being terminated in violation of public policy.

MEMORANDUM DECISION AND ORDER - 22

P.3d 1263, 1271 (Idaho 2012). In determining whether conduct is protected, Idaho courts consider whether there is a public policy and whether the employee acted in a manner sufficiently in furtherance of that policy. *Id*. The claimed public policy generally must be rooted in case law or statutory language. *Edmondson v. Shearer Lumber Prods*., 75 P.3d 733, 738 (Idaho 2003). Whether a sufficient public policy exists is a question of law. *Berrett v. Clark Cnty. Sch. Dist. No. 161*, 454 P.3d 555, 569 (Idaho 2019). Where the plaintiff identifies protected activity, the plaintiff must show the termination was motivated by that protected activity. *Bollinger*, 272 P.3d at 1271.

Hatfield identifies two public-policy theories upon which he relies. First, he contends the County terminated him because he filed and pursued a workers' compensation claim. Second, he argues Idaho Code § 72-419 supplies a separate public policy because the County did not provide workers' compensation coverage, compensation, or replacement assistance to harvest his hay and then terminated him for cutting the hay himself.

Hatfield's first theory identifies a cognizable public policy. *See Sorensen*, 799 P.2d at 74; *Berrett*, 454 P.3d at 569-70. But Hatfield must still show that the County terminated him because he exercised his workers' compensation rights. The record does not support this finding. Rather, the record shows that the County processed Hatfield's injury report through workers' compensation and only terminated him after receiving surveillance materials and medical evidence, which the County believed were inconsistent with Hatfield's restrictions and claimed limitations.

Hatfield's protected activity was filing or pursuing the workers' compensation claim. The conduct on which the County relied to terminate him, however, was not the filing of the claim itself, but Hatfield's violations of his medical restrictions, his misrepresentation and exaggeration

**MEMORANDUM DECISION AND ORDER - 23**

of his physical limitations, and his violation of County policies. Although Hatfield disputes the County's interpretation of the surveillance and medical evidence, that dispute does not show the County terminated him because he filed or pursued a workers' compensation claim. Hatfield has not identified evidence from which a reasonable jury could find the County fired him because he filed a workers' compensation claim. *See Bollinger*, 272 P.3d at 1271, 1273.

Hatfield's second theory relies on Idaho Code § 72-419. Section 72-419 addresses the calculation of an injured employee's average weekly wage under the workers' compensation statutory scheme. *See Vassar v. J.R. Simplot Co.*, 5 P.3d 475, 477-78 (Idaho 2000) (explaining that § 72-419 is mathematically focused and used to calculate the rate at which workers' compensation income benefits are paid). Contrary to Hatfield's assertion, § 72-419 does not impose on an employer a duty to provide replacement labor for an employee's personal farming operation, to insure that operation as part of the employee's employment, or to authorize the employee to perform physical work inconsistent with his medical restrictions. Moreover, Hatfield does not identify any Idaho case law, statutory language, or other authority establishing that § 72-419 creates the public policy he asserts here. *See Edmondson*, 75 P.3d at 738. For these reasons, Defendants are entitled to summary judgment on Hatfield's wrongful discharge claim.

### 5.      Procedural Due Process

Finally, Hatfield asserts a § 1983 claim alleging his termination violated his due process rights and argues the pretermination hearing was insufficient to comply with procedural due process (Dkt. 62 at 17). Due process is flexible and calls for the procedural protections the particular situation demands. *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976); *Gilbert v. Homar*, 520 U.S. 924, 930 (1997). To prevail, a plaintiff must show a constitutionally protected liberty or property interest, deprivation of that interest by the government, and constitutionally inadequate

MEMORANDUM DECISION AND ORDER - 24

process. *Shanks v. Dressel*, 540 F.3d 1082, 1090 (9th Cir. 2008). Defendants do not dispute, for purposes of the pending motions, that Hatfield had a protected property interest in his County employment (Dkt. 61 at 2). At issue is whether he received constitutionally adequate process.

In the public-employment termination context, *Loudermill* requires pretermination notice of the charges, an explanation of the employer's evidence, and an opportunity to present the employee's side. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545-46 (1985). A pretermination hearing does not need to be elaborate, however. *Id.* The Ninth Circuit has held that due process is satisfied where an employee received detailed written charges, was told dismissal was recommended, appeared at the hearing, presented on his behalf, and stated he had nothing further to say. *Hibbs v. Dep't of Human Resources*, 273 F.3d 844, 873 (9th Cir. 2001); *see also Madrid v. Concho Elementary School District No. 6 of Apache Cnty.*, 2010 WL 1980329, at *6 (D. Ariz. May 17, 2010), *aff'd*, 439 F. App'x 566 (9th Cir. 2011) (granting summary judgment where the employee received notice of the charges and evidence, was advised of hearing rights, including right to counsel and to present and challenge evidence, but chose not to attend).

Here, Hatfield received the requisite due process. The County's notice identified the alleged violations, the proposed discipline, the medical restrictions, the surveillance, the County's conclusion it showed Hatfield violating his restrictions, and the Employee Handbook provisions which the County believed Hatfield's conduct implicated (Dkt. 60-4 at 14-15). Policy 716 allowed Hatfield to present oral testimony, witness statements, and documents, and to have an attorney or other representative present (Dkt. 60-3 at 147; Dkt. 60-4 at 15). The County also continued the hearing from October 14 to October 17 at Hatfield's request (Dkt. 60-4 at 14-17).

The hearing transcript confirms that Hatfield had a meaningful opportunity to respond to the County's allegations. Henderson began the hearing by telling Hatfield that the meeting was his

**MEMORANDUM DECISION AND ORDER - 25**

opportunity to explain his side before a final decision. Hatfield asked Bates to clarify how the listed handbook provisions applied; Bates briefly responded; and Hatfield then presented his account at length (Dkt. 62-3 at 68-72 (10/17/22 Tr. at 2:08-18:22)). Hatfield addressed the same central issues he raises now, including the hay cutting; his communications with Weigel and Wallace; the County's refusal to pay to harvest his hay; his son's assistance; his use of pain medication; the County's alleged violation of his medical restrictions; his lack of notice that those restrictions applied at home; his work history; the MRI; and his discrimination concerns (Dkt. 62-3 at 70-72 (10/17/22 Tr. at 6:34-18:22)). The transcript does not show that Hatfield was cut off, ran out of time, asked to question any witness, or identified evidence he was unable to present. Instead, Hatfield ended by stating, "that's, really, that's all I have to say," "[b]ut that's all I have," and later, "[w]ell, I don't think I have anything else" (Dkt. 62-3 at 72-73 (10/17/22 Tr. at 18:22-19:17)).

Hatfield's procedural objections do not create a triable issue. Due process required an explanation of the County's evidence, not pretermination discovery of every item in the County's possession. *See Wilcox v. City of Phoenix*, No. CV 07-01875-PHX-MHM, 2009 WL 3174758, at *5 (D. Ariz. Sept. 29, 2009) (Murguia, J.) (rejecting due process claim based on failure to provide entire file because "[t]he Due Process Clause does not guarantee that parties in an adversarial proceeding may discover every piece of evidence they desire," and noting the employee "could have requested the photographs but chose not to"). Hatfield knew the operative evidence and factual theory: the County believed surveillance showed him cutting hay and engaging in activities inconsistent with his medical restrictions. He responded directly to that theory and does not identify any evidence that he requested and was refused, including the surveillance materials. *See id.* (ruling employee cannot base due-process claim on not receiving particular evidence where he

knew the theory, had an opportunity to respond, and did not request evidence). Further, the limits on questioning, the one-hour hearing framework, and Hatfield's choice to appear without counsel do not establish a constitutionally inadequate process. *Id*. Under these circumstances, Hatfield received adequate due process.

Hatfield also argues that Bates' participation in the hearing violated his due process rights because Bates was purportedly biased. Due process requires a fair tribunal, but unconstitutional bias is not presumed merely because a government official had prior involvement, was familiar with the facts, formed a preliminary disciplinary view, or combined investigative and disciplinary functions. *See Withrow v. Larkin*, 421 U.S. 35, 47, 55, 58 (1975); *Hortonville Joint School District No. 1 v. Hortonville Education Ass'n*, 426 U.S. 482, 492-93 (1976); *Stivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995). The Court in *Asmus v. Snake River School District No. 52*, No. 4:14-cv-00520-BLW, 2016 WL 1595349 (D. Idaho Apr. 20, 2016), applied this principle and granted the employer summary judgment because the plaintiff had not shown actual prejudgment or a reasonable appearance of prejudgment, despite the challenged official's involvement in the investigation, recommendation, testimony, and disciplinary proceedings. *Id*. at *4. The bias evidence here is even weaker than in *Asmus*.

Contrary to Hatfield's assertion that Bates was biased, the record does not show Bates initiated or paid for the M3 Investigations' surveillance, selected the surveillance dates, instructed M3 Investigations to watch for hay cutting, directed Dr. Stromberg's review, or drafted the due process notice. At most, Hatfield has shown that Bates had prior workplace involvement with Hatfield, was identified in the due process notice as the County representative, supplied or identified Employee Handbook provisions which he believed were implicated, participated in the hearing, and denied having a preliminary termination view before the hearing.

**MEMORANDUM DECISION AND ORDER - 27**

Those facts neither show actual nor an intolerable risk of bias. The transcript shows Henderson told Hatfield the hearing was his opportunity to present his side before a final decision; Hatfield asked for clarification; Bates briefly responded; and Hatfield then gave his account at length (Dkt. 62-3 at 68-72 (10/17/22 Tr. at 2:08-18:22)). The transcript does not show Bates refused to hear Hatfield's explanation, prevented him from presenting evidence, relied on an undisclosed theory, announced that the decision had already been made, presented witnesses, cross-examined Hatfield, or otherwise acted as an advocate at the hearing. Henderson opened and closed the hearing, and Bates's only substantive statement was answering a question from Hatfield (Dkt. 62-3 at 68-73 (10/17/22 Tr. at 2:08-19:17)).

Finally, the absence of a separate post-termination hearing is not a due process deprivation. Hatfield relies on several cases for the proposition that a later impartial review may cure limitations in an abbreviated or biased pretermination process and that where no meaningful post-termination review exists, the pretermination hearing must itself provide the process due under the circumstances. *See Walker v. City of Berkeley*, 951 F.2d 182, 184-85 (9th Cir. 1991); *Clements v. Airport Authority of Washoe Cnty.*, 69 F.3d 321, 332-33 & n.15 (9th Cir. 1995); *Sadid v. Vailas*, 936 F. Supp. 2d 1207, 1228-29 (D. Idaho 2013). Those cases do not hold, however, that a separate post-termination hearing is categorically required when the pretermination hearing itself provides notice, an explanation of the evidence, and a meaningful opportunity to respond before a decisionmaker not shown to be constitutionally biased. Recognizing that pretermination hearings do not always provide sufficient process, the facts here demonstrate that the pretermination hearing did provide Hatfield procedural due process before his termination. Accordingly, Defendants are entitled to summary judgment on Hatfield's due process claim.

MEMORANDUM DECISION AND ORDER - 28

**ORDER**

IT IS ORDERED that:

1. Defendants' Motion for Summary Judgment (Dkt. 59) is **GRANTED**.

2. Plaintiff's Motion for Partial Summary Judgment (Dkt. 60) is **DENIED**.

3. Plaintiff's claims are **DISMISSED** with prejudice.

4. The Court will enter judgment separately.

DATED: July 09, 2026

Amanda K. Brailsford
U.S. District Court Judge